UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUIS ANGEL SALAMAN, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:20cv32 (MPS) |
| v. | : | |
| | : | |
| SCOTT SEMPLE, ET AL., | : | |
| Defendants. | : | |

## RULING AND ORDER

The plaintiff, Luis Angel Salaman, was confined at the MacDougall-Walker Correctional

Institution in Suffield, Connecticut when he initiated this action by filing a complaint under 42

U.S.C. § 1983 against twenty-four defendants.[1]  The complaint is 151 pages in length and

includes 297 paragraphs of factual allegations and four paragraphs of legal claims.  *Id.* at 8-149.

Attached to the complaint are 102 pages of exhibits.  ECF No. 1-1.  The claims arise from

multiple sources, including an incident that occurred during the plaintiff's release from

confinement in January 2017 and the plaintiff's confinement at four different prison facilities as

a sentenced inmate over a time period from May 2018 to December 2019.

For the reasons set forth below, the claims arising from the plaintiff's confinement at

Garner Correctional Institution ("Garner") from June 2018 to October 2018 will either be

dismissed, dismissed with leave to amend, or severed and dismissed as having been improperly

joined in this action;  the claims arising from the incident that occurred in January 2017 during

the plaintiff's release from custody,  the claims arising from the plaintiff's confinement at

---

[1]  The defendants are: Commissioner Scott Semple, District Administrator Edward Maldonado, Wardens William Mulligan, Anthony Corcella, and Faucher, Deputy Warden Egan, Captains Kenny and Hurdle, Lieutenants Tolmis, Durkin, McNeil, John Doe and Jane Doe, Correctional Officers Robert Major, Blekis, Sciascia, Kennedy, Kenneth Hayward, and Snowden, Correctional Counselor Sheppard, Correctional Counselor/Freedom of Information Act ("FOIA") Liaison Hakins, Correctional Counselor/Administrative Remedies Coordinator ("ARC") Ibisevic, and ARC Michelle King.  *See* Compl., ECF No. 1, at

MacDougall-Walker Correctional Institution ("MacDougall-Walker") in May and June 2018, the claims arising from the plaintiff's confinement at Corrigan-Radgowski Correctional Institution ("Corrigan-Radgowski") from October 2018 to September 2019, and the claims arising from the plaintiff's confinement at Carl Robinson Correctional Institution ("Carl Robinson") from September 2019 to December 2019, will be severed and dismissed without prejudice as having been improperly joined in this action.

## I.      Standard of Review

The Court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A. This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee." *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted). Here, the plaintiff is proceeding *in forma pauperis*.

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A claim is facially plausible if it is supported by facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

1-7.                                        2

Although courts have an obligation to interpret "a *pro se* complaint liberally," the complaint must still include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

## II.     Factual Allegations

As of the first week of January 2017, the plaintiff was confined at MacDougall-Walker. Compl., ECF No. 1, ¶ 28.  One day during that week, the plaintiff visited with a friend or family member named Jamie Curto in the visitor's room at MacDougall-Walker.  *Id.* At one point, Correctional Officer Cotto passed through the visitor's room and announced that he was retiring from his job with the Department of Correction at the end of the week. *Id.* ¶ 29.

On January 9, 2017, prison officials at MacDougall-Walker released the plaintiff on bail. *Id.* ¶ 30.  On January 10, 2017, Jamie Curto received a text message from a telephone number she did not recognize.  *Id.*  The individual then called Ms. Curto and identified himself as Alex Cotto, stated that he had retired from his job as a correctional officer at MacDougall-Walker, and indicated that he wanted to get to know her better.  *Id.* ¶ 31.  Ms. Curto asked Cotto how he had obtained her cell phone number and he stated that he had his ways.  *Id.*  Ms. Curto hung up on Officer Cotto because she was afraid that he knew other personal information about her.  *Id.*

On January 10, 2017, Ms. Curto called MacDougall-Walker four times until she reached a deputy warden who she believed was William Mulligan.  *Id.* ¶ 32.  She complained that Correctional Officer Cotto was texting, harassing, and stalking her.  *Id.*  Deputy Warden Mulligan acknowledged that he knew who Correctional Officer Cotto was but could not take action against him because he had retired from the Department of Correction.  *Id.* ¶ 33.  *Id.*  Later that evening, the plaintiff visited Ms. Curto at her home and learned that Officer Cotto had called

her and was stalking and harassing her.  *Id.* ¶ 34.

     The plaintiff became very upset and texted Officer Cotto.  *Id.*  He informed Officer Cotto that he had been released on bail and instructed Cotto to stop texting Ms. Curto.  *Id.*  The plaintiff also accused Cotto of using personal information about Ms. Curto that was included on his Department of Correction visitation list to stalk and harass Ms. Curto and threatened to report Cotto. *Id.* ¶ 35.  Officer Cotto mentioned that he would soon be starting work as a New Haven Police Officer and suggested that he would see the plaintiff around New Haven.  *Id.* ¶ 36.  The plaintiff considered this statement to be a threat and informed Officer Cotto that he would be filing a complaint with the City of New Haven and the New Haven Police Department.  *Id.* ¶ 37. Officer Cotto then apologized and indicated that he would stop texting Ms. Curto.  *Id.* ¶ 38.  The plaintiff stated that he still intended to report Officer Cotto.  *Id.*

     On May 17, 2018, in *State v. Salaman*, Docket No. N23N-CR16-0166479-S, a judge sentenced the plaintiff to five years of imprisonment execution suspended after two years and followed by two years of probation pursuant to his plea of guilty to one count of possession of a narcotic with intent to sell or dispense in violation of Conn. Gen. Stat. § 21a-277(a) and one year of imprisonment pursuant to his plea of guilty to one count of interfering with an officer in violation of Conn. Gen. Stat. § 53a-167a.  *Id.* ¶ 39.[2]  At soon as the sentencing hearing had concluded, prison officials transported the plaintiff from the courthouse to New Haven Correctional Center to begin his sentence.  *Id.* ¶ 39.  On May 22, 2018, prison officials at New Haven Correctional Center transferred the plaintiff to Willard-Cybulski Correctional Institution, a level 2 facility.  *Id.* ¶ 40.  On May 29, 2018, prison officials transferred the plaintiff from

---

[2]  Information regarding both convictions and sentences is available on the State of Connecticut's Judicial Branch website at: http://www.jud.ct.gov/jud2/crim.htm under Criminal/Motor Vehicle;

Willard-Cybulski to MacDougall-Walker, a level 4 facility. *Id.* ¶¶ 40-41.

**Confinement at MacDougall-Walker**

During his admission to MacDougall-Walker, a correctional officer approached the plaintiff and identified him as having had an issue with Correctional Officer Cotto. *Id.* ¶ 42. The plaintiff called Ms. Curto and asked her to contact the Commissioner of Correction about a complaint that he and Ms. Curto had filed in February 2017 regarding the conduct of Officer Cotto in texting, calling and harassing Ms. Curto in January 2017. *Id.* ¶¶ 44, 323(a). A few days later, the plaintiff called Ms. Curto and asked her to email the warden and to complain about his transfer to MacDougall-Walker because the plaintiff suspected someone might retaliate against him for complaining about his interaction with Officer Cotto in 2017. *Id.* ¶ 45.

At one point during a unit tour, the plaintiff asked whether Warden Mulligan had received any telephone calls or emails from Ms. Curto. *Id.* ¶ 49. Warden Mulligan indicated that he had spoken to Ms. Curto and her concerns would be investigated. *Id.* ¶¶ 49-50. On June 7, 2018, Ms. Curto filed a complaint with Warden Mulligan about the incident involving Officer Cotto that had occurred in January 2017. On June 11, 2018, Ms. Curto faxed the complaint to Warden Mulligan. *Id.* ¶ 53. On June 11, 2018, Warden Mulligan transferred the plaintiff to Garner. *Id.* ¶¶ 54-55.

**Confinement at Garner**

After arriving at Garner, the plaintiff learned that his level had been raised from a 2 to a 4. *Id.* ¶ 56.

On July 11, 2018, the plaintiff filed a grievance seeking an investigation into the improper attempts by Officer Cotto to communicate with Ms. Curto in January 2017. *Id.* ¶ 60.

---

Convictions - by Docket Number using Docket No. N23N-CR16-0166479-S.

On August 10, 2018, officers announced that they would be conducting searches of the cells in the plaintiff's housing unit because two fights had broken out in the unit on August 8, 2018.  *Id.* ¶ 61.  At the time, the plaintiff was confined in Cell 202 with Inmate Benitez.  *Id.*  Officers removed the inmates from cells 202 to 206 and escorted them to the bottom tier to be strip-searched.  *Id.* ¶ 62.  After the officers had completed the search of the plaintiff's cell, Lieutenant Tolmis sent both Inmate Benitez and the plaintiff to the restrictive housing unit because officers had discovered a number of contraband items in the cell and the officers needed to determine which items belonged to the plaintiff and which items belonged to Inmate Benitez.  *Id.* ¶¶ 63-64. 45.  Later that evening a correctional officer brought the plaintiff some of his personal property items from his cell and a property inventory form.  *Id.* ¶ 65.  The plaintiff noticed that two pairs of sneakers that belonged to his cellmate were listed on his property inventory form and that his sneakers were not listed on the form and informed the officer about these discrepancies.  *Id.* ¶¶ 66-67.  The officer understood the issue and asked the plaintiff to sign the form and to send him a request later to fix the discrepancies on the form.  *Id.* ¶¶ 68-69.  The plaintiff agreed to sign the form and to send a request to the officer.  *Id.* ¶ 69.

On August 13, 2018, Correctional Officers Major and Blekis escorted the plaintiff to Captain Kenny's office.  *Id.* ¶ 70.  The plaintiff wanted to know if he had been sent to the restrictive housing unit because officers had found a stinger, an extension cord with two batteries attached to it, in his cell.  *Id.* ¶ 71, 83.  Captain Kenny asked the plaintiff what he knew about a drug called Suboxone.  *Id.*  The plaintiff stated that he was not familiar with Suboxone.  *Id.*  Officer Major indicated that he had found a drug called Suboxone in one of the plaintiff's items of personal property.  *Id.* ¶ 71.  The plaintiff did not believe Officer Major.  *Id.*  Captain Kenny

wanted to know whether the plaintiff had put Suboxone up his a\*\*.  *Id.* ¶ 72.   This statement

made the plaintiff feel uncomfortable and he asked to be returned to his cell.  *Id.* ¶ 73.   Officers

Major and Blekis escorted the plaintiff back to his cell.  *Id.* ¶ 74.   A short time later, Officers

Major and Blekis escorted the plaintiff back to Captain Kenny's office.  *Id.* ¶¶ 75-76.

A Connecticut State Trooper was in the office with Captain Kenny and was holding a

pair of black Reebok sneakers.  *Id.* ¶¶ 76-77.   The State Trooper asked the plaintiff if the

sneakers belonged to him.  *Id.* ¶ 77.   The plaintiff said that his sneakers were a size 7 and the

sneakers the Trooper was holding were not his sneakers.  *Id.*  Captain Kenny pointed out that the

sneakers were listed on the plaintiff's property inventory form.  *Id.* ¶ 78.   The plaintiff explained

that there was a mix up on his inmate property form and that the property officer was aware that

the sneakers listed on the form were not his sneakers.  *Id.*  The State Trooper indicated that he

would be filing a warrant for the plaintiff's arrest on drug possession charges.  *Id.* ¶ 79.

As Officers Major and Blekis escorted the plaintiff out of the office, Captain Kenny again

made a comment about the plaintiff putting Suboxone up his a\*\*.  *Id.* ¶¶ 79-80.  The plaintiff

accused Captain Kenny of sexual harassment.  *Id.*

After the plaintiff arrived back at his cell, a correctional officer delivered a disciplinary

report to the plaintiff.  *Id.* ¶ 81.   In the report, Officer Major charged the plaintiff with the Class

A offense of possessing contraband in an item of personal property.  *Id.* ¶ 82.   The contraband

was found in the the black Reebock sneakers and consisted of two plastic-wrapped packages

with 12 sugar packets containing paper-like material that tested positive for Suboxone.  *Id.*

About two hours later, the same correctional officer delivered a second disciplinary report to the

plaintiff.  In the report, Officer Blekis charged the plaintiff with the Class A offense of

possessing contraband in a common area of his cell.  *Id.* ¶ 83.  That contraband item consisted of an extension cord that had been altered by attaching batteries to one end of it.  *Id.*

On August 14, 2018, Officer Sciascia, informed the plaintiff that he had been assigned to investigate the facts supporting the two disciplinary reports for contraband that had been issued to the plaintiff.  *Id.* ¶ 84.   Officer Sciascia asked the plaintiff how he would be pleading to the reports and whether he would like to make a statement regarding the disciplinary charges.  *Id.* ¶¶ 84-5, 89-90.   The plaintiff indicated that he would be pleading not guilty to both reports and would like to make statements regarding the disciplinary charges.  *Id.* ¶¶ 85-87, 89-93.  Officer Sciascia asked the plaintiff whether he would like to have an advisor assist him in preparing for the hearing and presenting his case at the hearing to be held on both disciplinary charges.  *Id.* ¶¶ 88, 93.  The plaintiff indicated that he would like an advisor.  *Id.*  Officer Sciascia assigned Correctional Counselor Sheppard to be the plaintiff's advisor on both disciplinary charges.  *Id.*

On August 14, 2018, the plaintiff submitted a complaint to Captain Hurdle about the two disciplinary reports that had been issued to him and the sexual comments made by Captain Kenny.  *Id.* ¶ 94.  On August 15, 2018, the plaintiff noticed that Inmate Benitez was in the recreation yard.  *Id.* ¶ 95.  When Inmate Benitez warned the plaintiff not to say anything about what had been found in their cell on August 10, 2018, the plaintiff became very upset and called Inmate Benitez a rapist and stated that he hoped that other inmates would physically harm Benitez when they found out what Benitez had done to him.  *Id.* ¶ 97.  Later that day, a correctional officer delivered a disciplinary report to the plaintiff.  *Id.* ¶ 98.  Correctional Officer Nemec charged the plaintiff with threatening Inmate Benitez in the recreation yard.  *Id.* ¶¶ 98-99.

The plaintiff was very upset about receiving the disciplinary report because it did not

accurately describe the statements that he had made to Inmate Benitez.  *Id.* ¶ 100.  The plaintiff

sent a request to Captain Hurdle complaining about the issuance of the disciplinary report.  *Id.* ¶

100-01.

On August 16, 2018, the plaintiff completed a request seeking permission from

Correctional Treatment Officer O'Donnell to make two legal calls.  *Id.* ¶ 102.  The plaintiff

asked Correctional Officer Kennedy to put the request in Treatment Officer O'Donnell's box.

Instead of doing so immediately, Officer Kennedy brought the request to the officer's desk and

placed it next to Officer Sciascia.  *Id.* ¶¶ 103-04.   Officer Sciascia picked up the request and put

it in his pocket.  *Id.* ¶¶ 104-15.  The plaintiff asked Officer Sciascia why he had put the request in

his pocket.  *Id.* ¶ 105.  Officer Sciascia stated that he thought the request was for him or for

Captain Kenny.  *Id.* ¶¶ 105-06.  Officer Sciascia then placed the request in Treatment Officer

O'Donnell's mailbox.  *Id.* ¶ 107.  The plaintiff immediately filed a grievance about the incident

involving Officers Sciascia and Kennedy and sent a request to a captain to preserve the video

footage of the incident.  *Id.* ¶¶ 109-10.

Later that day, at the plaintiff's request, a correctional officer informed mental health

providers that the plaintiff had requested to be seen.  *Id.* ¶ 111.   A mental health staff member

came to the plaintiff's cell and the plaintiff explained why he was depressed and stressed.  *Id.* ¶¶

113-14.  The mental health staff member indicated that if the plaintiff was feeling like he might

hurt himself, she could place him in a special room for his safety.  *Id.*  The plaintiff indicated that

he had tried to hurt himself in the past but did not articulate any present thoughts of self-harm.

*Id.* ¶ 115.

After the mental health staff member left the plaintiff's cell, Officer Sciascia arrived and

asked the plaintiff how he would be pleading to the disciplinary report for threats and whether he would like Correctional Counselor Sheppard to be assigned as his advisor.  *Id.* ¶ 117.  The plaintiff stated that he would be pleading not guilty and that he would like Correctional Counselor Sheppard to be appointed as his advocate.  *Id.*

On August 17, 2018, the plaintiff was stressed and depressed and thought about committing suicide.  *Id.* ¶ 119.  As Captain Hurdle walked by the plaintiff's cell, the plaintiff complained about how officers were treating him.  *Id.* ¶ 120.  Captain Hurdle told the plaintiff that he would be fine.  *Id.*

The plaintiff felt hopeless and did not want to live anymore.  *Id.* ¶ 121.  From about 2:00 p.m. to 3:00 p.m., Mental Health Staff Member Bill listened to the plaintiff explain his issues and describe his complaints about how prison officials had been treating him.  *Id.* ¶¶ 21-22.

After Bill left, the plaintiff began to think about the fact that his former cellmate, Inmate Benitez, had sexually assaulted him and that Captain Kenny had made sexual comments about him.  *Id.* ¶ 123.  He then figured out how he was going to try to hang himself.  *Id.* ¶ 124.  He tied a bed sheet around the metal cage that covered the fire sprinkler in his cell.  *Id.* ¶ 125.  After observing that Officer Hayward was reading a book at a desk and that another officer was sleeping in a chair, the plaintiff tied the other end of the sheet around his neck, stepped off his bunk, and hung there until he passed out.  *Id.* ¶¶ 125-26.  He awoke in an ambulance on its way to University of Connecticut Health Center.  *Id.*

Upon his release from the hospital, medical officials at Garner placed the plaintiff in the Inpatient Medical Unit I at Garner.  *Id.* ¶ 127.  A medical provider checked on the plaintiff every fifteen minutes.  *Id.*  The plaintiff received a disciplinary report issued by Correctional Officer

Hayward for interfering with safety and security due to his attempt to hang himself in his cell. *Id.* ¶ 128.  Lieutenant Durkin signed the disciplinary report as Officer Hayward's supervisor.  *Id.*

On August 19, or 20, 2018, the plaintiff informed a nurse that he had attempted to hang himself in part because Inmate Benitez had sexually assaulted him and Captain Kenny had made sexual comments about him.  *Id.* ¶¶ 130-31.  The nurse reported this information to a mental health staff member who came and spoke to the plaintiff and indicated that she would start the process of filing a PREA complaint.  *Id.* ¶ 131.  Shortly after meeting with the mental health staff member, a lieutenant employed by the Department of Correction and a Connecticut State Trooper interviewed the plaintiff and recorded the plaintiff's statements.  *Id.* ¶¶ 131-34.

On August 20, 2018, Officer Sciascia asked the plaintiff how he would be pleading to the disciplinary report charging him with interfering with safety and security.  *Id.* ¶ 135.  The plaintiff indicated that he would be pleading not guilty to the disciplinary charge and would like to address the charge at a hearing.  *Id.* ¶¶ 85-87, 89-93.  On August 21, 2018, Correctional Counselor Sheppard, in her role as the plaintiff's advisor, met with the plaintiff and recorded partial statements given by him about the incident leading to the issuance of the two disciplinary reports for contraband and the incident leading to the issuance of the disciplinary report for threats. *Id.* ¶¶ 137-46.  Counselor Supervisor Sheppard indicated that she would supplement his statements when she met with him the day before the hearing and after she had reviewed documents and evidence pertaining to the disciplinary charges.  *Id.* ¶¶ 140, 143, 146.  Because the plaintiff had a feeling that Correctional Counselor Sheppard might not perform her job as his advisor effectively, he called Ms. Curto and asked her to email Warden Corcella to complain about Correctional Counselor Sheppard.  *Id.* ¶ 147.

On August 27, 2018, Correctional Counselor Sheppard, met with the plaintiff in his cell in the Inpatient Medical Unit II and recorded a partial statement given by him about the incident leading to the issuance of the disciplinary report for interfering with safety and security.  *Id.* ¶¶ 148-49.  On August 27, or 28, 2018, prison officials transferred the plaintiff to a cell in the restrictive housing unit.  *Id.* ¶ 150.

On August 30, 2018, the plaintiff participated in a hearing held to address all four disciplinary reports issued to him earlier that month.  *Id.* ¶¶ 151-52, 159-83.  Investigating Officers Sciascia and Snowden and Correctional Officer Ibisevic were present at the hearing and Lieutenant/Disciplinary Hearing Officer McNeil presided over the hearing.  *Id.* ¶ 152.  Because Correctional Counselor Sheppard was unavailable, Officer Ibisevic acted as the plaintiff's advisor during the hearing.  *Id.* ¶¶ 153-56.  Disciplinary Hearing Officer McNeil denied the plaintiff's request for a continuance.  *Id.* ¶¶ 153-58.

After listening to the plaintiff's statements and considering other evidence, Disciplinary Hearing Officer McNeil found the plaintiff guilty of all four disciplinary charges.  *Id.* ¶¶ 159-83.  Disciplinary Hearing Officer McNeil imposed the following sanctions pursuant to his finding of guilt as to the four charges:  (1) fifteen days of punitive segregation, thirty days loss of recreation privileges, ninety days loss of commissary privileges, and fifteen days loss of Risk Reduction Earned Credit ("RREC") as to the charge of contraband involving possession of the altered extension cord; (2) fifteen days of punitive segregation, thirty days loss of recreation privileges, ninety days loss of telephone privileges, and fifteen days loss of RREC as to charge of contraband for possession of Suboxone; (3) fifteen days of punitive segregation, thirty days loss of recreation privileges, ninety days loss of telephone privileges, and fifteen days loss of RREC

as to charge of threats; (4) fifteen days of punitive segregation, thirty days loss of recreation privileges, sixty days loss of visitation privileges, and fifteen days loss of RREC as to the charge of interfering with safety and security.   *Id.* ¶¶ 165, 171, 175, 183.   Later that morning, the plaintiff received copies of the Disciplinary Process Summary Reports.  *Id.* ¶ 184.  On August 31, 2018, Officer Snowden delivered a revised Disciplinary Process Summary Report that included the plaintiff's plea of not guilty and finding of guilt by Hearing Officer McNeil as to the charge of contraband involving possession of Suboxone.  *Id.* ¶ 186.

On August 16, 2018, August 28, 2018, August 30, 2018, and August 31, 2018, the plaintiff submitted FOIA requests to Correctional Counselor/FOIA Liaison Hakins seeking documents related to the disciplinary reports issued to him on August 10, 2018, August 13, 2018, August 15, 2018, and August 17, 2018.  *Id.* ¶¶ 228-29.   On September 6, 2018, the plaintiff sent a letter to Commissioner Semple complaining that Hakins had not provided him with responses to his FOIA requests before his disciplinary hearing on August 30, 2018.  *Id.* ¶ 230.

On September 3, 2018, the plaintiff filed appeals of the determinations by Hearing Officer McNeil that he was guilty of the charge of interfering with safety and security and the charge of possessing contraband in the form of an altered extension cord.  *Id.* ¶ 188-209.  On September 4, 2018, the plaintiff filed appeals of the determinations by Hearing Officer McNeil that he was guilty of the charge of threats and the charge of possessing contraband in the form of Suboxone.  *Id.* ¶¶ 210-26; 323(f).

On September 28, 2018, the plaintiff received letters from District Administrator Maldonado denying his appeals of the determinations by Hearing Officer McNeil that he was guilty of the charge charges of threats, interfering with safety and security, and possessing

contraband in the form of Suboxone.  *Id.* ¶ 244-54.  188-209.  On October 10, 2018, the plaintiff received a letter from District Administrator Maldonado denying his appeal of the determination by Hearing Officer McNeil that he was guilty of the charge of possessing contraband in the form of an altered extension cord.  *Id.* ¶ 255.

On October 14, 2018, the plaintiff learned that Warden Corcella had sent a letter to Ms. Curto to inform her that her visiting privileges had been suspended because the Department of Correction suspected that she had conveyed contraband into Garner.  *Id.* ¶¶ 231-32.  On October 15, 2018, a correctional treatment officer informed the plaintiff that prison officials were reviewing the suspension of Ms. Curto's visitation privileges.  *Id.* ¶ 231.

On September 13, 2018, the plaintiff filed a grievance claiming that staff members at Garner had failed to keep him safe by preventing him from trying to commit suicide on August 17, 2018.  *Id.* ¶¶ 236-38.  On September 16, 2018, the plaintiff filed a grievance about the handling of the PREA incident involving the alleged sexual assault by his cellmate and a grievance about his level being changed from a 2 to a 4 without an explanation or a hearing.  *Id.* ¶¶ 239-41.  On September 28, 2018, Correctional Counselor/Administrative Remedies Coordinator ("ARC") Ibisevic returned a grievance filed by the plaintiff on August 16, 2018 against Officers Sciascia and Kennedy because the plaintiff had failed to attempt to informally resolve the issue.  *Id.* ¶ 242.  The plaintiff resubmitted the grievance but did not receive a response to it.  *Id.* ¶ 243.

**Confinement at Corrigan-Radgowski – October 2018 to September 2019**

On October 19, 2018, the plaintiff completed his confinement in the restrictive housing unit and prison officials at Garner transferred him to Corrigan-Radgowski.  *Id.* ¶ 256.  Upon his

arrival, the plaintiff informed two correctional officers that he needed to be housed in a cell by himself because of the PREA incidents that he had experienced at Garner.  *Id.* ¶ 258.  A shift supervisor informed the plaintiff that there were no single cells available, but that he would do his best to make sure the plaintiff was placed in a single cell in the future.  *Id.* ¶¶ 259-60.  The plaintiff submitted a request to be seen by a mental health provider but received no response to his request.  *Id.* ¶ 361.

On October 23, 2018, the FOIA Liaison at Corrigan-Radgowski delivered documents to the plaintiff in response to the requests that he had submitted to Correctional Counselor/FOIA Liaison Hakins at Garner.  *Id.* ¶ 262.  The documents pertained to the disciplinary reports issued to the plaintiff at Garner in August 2018.  *Id.* ¶¶ 262-81, 284-98.

On October 26, 2018 and on November 6, 2018, officers escorted the plaintiff to the admitting and processing area and required him to submit to a urine test.  *Id.* ¶¶ 299, 309.  On both occasions, other officers searched the plaintiff's cell while he waited in the admitting and processing area.  *Id.*  The officers who conducted the searches left the plaintiff's property strewn about the cell.  *Id.* After the second search, the plaintiff observed that his CD player was broken. *Id.* ¶ 309.

On November 25, 2018, the plaintiff filed a grievance complaining that Correctional Counselor/ARC Ibisevic had failed to answer grievances that he had filed at Garner.  *Id.* ¶ 310. ARC King did not answer the grievance.  *Id.* ¶ 311.  The plaintiff filed an appeal of King's failure to respond to the grievance.  *Id.*  ARC King never attempted to track down the responses to all of the grievances that the plaintiff had filed at Garner.  *Id.* ¶¶ 311-13.  On December 17, 2018, the plaintiff filed a new grievance questioning the basis for the decision to increase his

level from a 2 to a 4 after his transfer to MacDougall-Walker from Willard-Cybulski on May 29, 2018. *Id.* ¶ 314. On January 11, 2019, ARC King rejected the grievance because challenges to classification decisions must be made within fifteen days of the change in classification. *Id.* ¶ 315. In response, ARC King indicated that his appeal would not be answered because the Unit Administrator's decision was final. *Id.* ¶ 316.

### Confinement at Carl Robinson – September 2019 to December 2019

On September 18, 2019, prison officials at Corrigan-Radgowski transferred the plaintiff to Carl Robinson, a level 3 facility. *Id.* ¶ 317. On September 20, 2019, the plaintiff became aware that Captain Kenny had been transferred to Carl Robinson and promoted to Deputy Warden. *Id.* ¶ 317. Kenny spoke to the plaintiff on September 20, 2019 and on November 7, 2019. *Id.* As of December 6, 2019, the plaintiff had completed his session in the restrictive housing unit. *Id.* ¶ 318. Kenney informed the plaintiff that officials would be transferring him to another prison facility at some point that day. *Id.* The plaintiff spoke with his family and learned that prison officials had arranged for him to be transferred to MacDougall-Walker, a level 4 facility. *Id.* ¶ 319.

### III.   Discussion

As a preliminary matter, the Court notes that the plaintiff's address is listed on the docket as MacDougall Correctional Institution, 1153 East Street South, Suffield, Connecticut 06080. State of Connecticut Department of Correction records reflect, however, that the plaintiff is no longer confined in any facility within the Department of Correction. *See* http://www.ctinmateinfo.state.ct.us/searchop.asp (Plaintiff's CT DOC Inmate Number is 262626). Local Rule 83.1(c)(2) requires a self-represented litigant to keep the Clerk apprised of

an address where Court orders and rulings can be mailed to him or her.  The Court previously advised the plaintiff that if his address changed during the litigation of the case, he must submit a written notice of a current mailing address and that if he failed to keep the Clerk informed of his current address, the case would be subject to dismissal.  *See* Order, Doc. 9.  The plaintiff has failed to notify the Clerk about his new mailing address as required by the Court's Order and Local Rule 83.1(c)(2).  The Court will give him one additional opportunity to do so.

The plaintiff claims that the defendants violated his rights under the First, Fourth, Eighth and Fourteenth Amendments.  He seeks punitive and compensatory damages and injunctive and declaratory relief.

### A.     Monetary Damages – Official Capacity

The plaintiff sues the defendants in their individual and official capacities.  To the extent that he seeks compensatory and punitive damages from the defendants in their official capacities for violations of his federal constitutional rights, those requests are barred by the Eleventh Amendment and are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).  *See Kentucky v. Graham*, 473 U.S. 159 (1985) (Eleventh Amendment, which protects the state from suits for monetary relief, also protects state officials sued for damages in their official capacity).

### B.     Declaratory Relief

The plaintiff seeks a declaration that the defendants violated his First, Fourth, Eighth, and Fourteenth Amendment rights.  Under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), a plaintiff may seek prospective injunctive and declaratory relief to address an ongoing or continuing violation of federal law or a threat of a violation of federal law in the future.  *See In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir. 2007); *Ward v. Thomas*, 207 F.3d 114, 120

(2d Cir. 2000). In determining whether *Ex Parte Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 645 (2002) (internal quotation marks and citation omitted).

The plaintiff is no longer confined within a State of Connecticut Department of Correction prison facility. His request for declaratory relief is addressed to conditions and incidents that occurred in January 2017 during his release from prison and during his confinement at MacDougall-Walker, Garner, Corrigan-Radowski and Carl Robinson from May 2018 to December 2019. Absent a request for relief to remedy ongoing violations of the plaintiff's rights or a threat of a violation of his rights in the future, a declaration that the defendants violated his rights in the past is barred by the Eleventh Amendment. *See Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past"); *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young*... to claims for retrospective relief") (citations omitted). Accordingly, the request for a declaratory judgment is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### C.     Injunctive Relief

The complaint includes requests for injunctive relief seeking orders directing the defendants to follow all Department of Correction policies and rules, to stop retaliating against the plaintiff, to thoroughly investigate "the matter again," and to house him in a single cell. Compl. ¶ 335.

An injunction is a drastic and extraordinary remedy, which should not be granted as a

18

matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation

omitted).  To warrant preliminary injunctive relief, the moving party must demonstrate (a) that

he or she will suffer "irreparable harm" in the absence of an injunction, and (b) either (1) a

"likelihood of success on the merits or (2) sufficiently serious questions going to the merits [of

the case] to make them a fair ground for litigation and a balance of hardships tipping decidedly

toward the party requesting preliminary injunctive relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d

401, 405-06 (2d Cir. 2011) (internal quotation marks omitted).  If a party seeks

a permanent injunction, he or she "must demonstrate (1) irreparable harm ... and (2) actual

success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). Thus, the standard

for a permanent injunction is similar to the standard for a preliminary injunction, but a plaintiff

must show actual success rather than a likelihood of success.  *See Amoco Prod. Co. v. Vill. of

Gambell*, 480 U.S. 531, 546 n.12 (1987).

An inmate has "no constitutional right to an investigation of any kind by government

officials."  *Banks v. Annuci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted).

Accordingly, the request for injunctive relief seeking an investigation of the conduct of the

defendants is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

The Second Circuit has held that an inmate's request for prospective injunctive relief

from correctional staff in connection with conditions of confinement at a particular correctional

institution becomes moot when the inmate is discharged from that institution, is transferred to a

different institution or has received the relief requested.  *See Martin-Trigona v. Shiff*, 702 F.2d

380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can

no longer be given or is no longer needed"); *Sheppard v. Roberts*, No. 3:20-CV-875 (VAB),

2020 WL 6119422, at *12 (D. Conn. Oct. 16, 2020) ("When a prisoner is released from custody, claims for injunctive relief against prison officials become moot.") (citations omitted).  The requests for injunctive relief asserted in the complaint pertain to the plaintiff's confinement at MacDougall-Walker, Garner, Corrigan-Radgowski, and Carl Robinson from May 2018 to December 2019.  As indicated above, the plaintiff has been released from the custody of the Department of Correction.

Because the plaintiff is no longer confined in any facility within the Connecticut Department of Correction, the requests asserted in the complaint seeking injunctive relief from prison officials that are related to conditions of confinement in Connecticut prison facilities are moot and are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### D.    Confinement at Garner from June 2018 to October 2018

The plaintiff alleges that during his confinement at Garner, defendants Semple, Corcella, Egan, Kenny and Hurdle retaliated against him in violation of the First Amendment; defendants Semple, Corcella, and Egan were deliberately indifferent to his mental health and medical needs in violation of the Eighth Amendment; defendants Semple, Corcella, Egan, Kenny and Hurdle failed to protect him from sexual assault by his cellmate in violation of the Eighth Amendment; defendant Kenny sexually harassed him in violation of the Eighth Amendment; and defendants Corcella, Egan, McNeil, Durkin, Tolmis, Kenny, Hurdle, Major, Blekis, Sciascia, Kennedy, Hayward, Snowden, Hakins, Ibisevic, Sheppard, and Maldonado deprived him of procedural due process in connection with the issuance of disciplinary reports and the disposition of those reports after a hearing and on appeal in violation of his Fourteenth Amendment rights.

### 1.    Fourteenth Amendment – Disciplinary Reports

20

The plaintiff alleges that Captains Kenny and Hurdle, Lieutenant/Disciplinary Hearing Officer McNeil, Lieutenant Durkin, Correctional Officers Major, Blekis, Sciascia, Hayward, and Snowden, Correctional Counselor/ARC Ibisevic, Correctional Counselor Sheppard, and District Administrator Maldonado violated his procedural due process rights by either issuing him false disciplinary reports, failing to conduct a thorough investigation of the disciplinary charges, providing inadequate assistance to him in preparing for and participating in the hearing, neglecting to give him twenty-four-hour notice of the date of the hearing, refusing to provide him with access to the evidence during the hearing, or denying his appeals of the disciplinary findings.  He asserts that prior to the hearing, he was not permitted to  review all the evidence in support of the disciplinary charges and that during the hearing, Disciplinary Investigator Sciascia and Disciplinary Hearing Officer McNeil refused to permit him to call witnesses or grant him a continuance.  He contends that there was insufficient evidence to support the findings of guilt by the disciplinary hearing officer and district administrator on appeal.

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property."  U.S Const. amend. XIV. "Liberty interests protected by the Fourteenth Amendment may arise from two sources -- the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).  The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court reexamined "the

21

circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause." *Id.* at 474. The Court explained that in the prison setting, liberty interests protected by Due Process "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Court held that Conner's confinement in segregation for thirty days "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486. Thus, an inmate has a protected liberty interest only if the disciplinary sanctions caused him to suffer an "atypical and significant hardship" in comparison to "the ordinary incidents of prison life." *Id.*

Although the duration of disciplinary confinement is an important factor to consider in determining whether a deprivation constitutes an atypical and significant hardship, the Second Circuit has "explicitly avoided a bright line rule that a certain period of ... confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations and quotation marks omitted). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement ... rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (citations and quotation marks omitted).

Here, the plaintiff alleges that at the conclusion of the hearing held on August 30, 2018, Disciplinary Hearing Officer McNeil imposed multiple sanctions after finding him guilty of each

of the four disciplinary charges, including fifteen days of punitive segregation and forfeiture of

fifteen days of RREC as to each disciplinary charge. *See* Compl. ¶¶ 165, 171, 175, 183. The

plaintiff suggests that he spent at most fifty-four days in punitive segregation from August 27,

2018 to October 19, 2018, as a result of the disciplinary charges and sanctions imposed at the

conclusion of the disciplinary hearing. In *Palmer*, the Second Circuit held that confinement in a

restrictive housing unit for " fewer than 101 days "could constitute atypical and significant

hardships if the conditions were more severe than the normal SHU conditions ... or a more fully

developed record showed that even relatively brief confinements under normal SHU conditions

were, in fact, atypical." 364 F.3d at 65; *see also Davis v. Barrett*, 576 F.3d 129, 135 (2d Cir.

2009) (remanding for fact-finding concerning 55–day SHU confinement).

Even if the Court was to assume that the fifty-four-day period that the plaintiff spent in

punitive segregation was of sufficient duration to meet the *Sandin s*tandard, the plaintiff has

asserted no facts to suggest that the conditions that he endured in punitive segregation were

atypical or significantly more harsh or restrictive in comparison to the conditions in general

population. To determine whether an inmate endured an atypical or significant hardship, a court

must examine the conditions of confinement "'in comparison to the hardships endured by

prisoners in general population, as well as prisoners in administrative and protective

confinement, assuming such confinements are imposed in the ordinary course of prison

administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d

Cir. 1999)). Absent any allegations about the nature of the conditions to which the plaintiff was

exposed during his fifty-four-day confinement in punitive segregation, the Court cannot assess

whether the conditions were significantly more harsh or atypical than the conditions in general

population.  *See, e.g., Falls v. Campbell*, No. 17-CV-35 (KMK), 2019 WL 1255768, at *10

(S.D.N.Y. Mar. 19, 2019) (Although inmate had alleged that he had been placed in restrictive

housing unit for 150 days, Court concluded that the "due process claim must be dismissed

nonetheless because [inmate] has asserted *no* facts whatsoever that would allow the Court to

assess whether the "regime to which [he] was subjected" constituted a significant and atypical

hardship compared with ordinary prison conditions.") (collecting cases); *Vogelfang v. Capra*,

889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (finding three months of confinement did not trigger

due process protections where the plaintiff "[did] not plead any other facts tending to show that

her SHU confinement was uniquely harsh").  Accordingly, the Fourteenth Amendment

procedural due process claims asserted against Captains Kenny and Hurdle, Disciplinary Hearing

Officer McNeil, Lieutenant Durkin, Correctional Officers Major, Blekis, Sciascia, Hayward, and

Snowden, Correctional Counselor Ibisevic, Correctional Counselor Sheppard, and District

Administrator Maldonado, are dismissed without prejudice to filing an amended complaint.

Furthermore, it is unclear whether the plaintiff intended to challenge the forfeiture of

RREC sanctions imposed by Hearing Officer McNeil as well as the sanctions that affect his

conditions of confinement such as loss of phone and recreation privileges.  The loss of RREC is

a sanction that affects the duration of an inmate's confinement.  *See* State of Connecticut

Department of Correction Administrative Directive 4.2A(4) (2013), *available at*

https://portal.ct.gov//media/DOC/Pdf/Ad/ad0402Apdf.pdf ("RREC could affect an inmate's

discharge date if in compliance.").  If the plaintiff challenges sanctions affecting both

the duration of his confinement and the conditions of his confinement, his due process claims

relating to the issuance of the disciplinary report and disposition of the disciplinary charge at a

hearing are barred by the favorable termination rule set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994).

In *Heck*, the Supreme Court held that a claim for money damages is not cognizable under 42 U.S.C. § 1983 if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless that "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ..., or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87 (citation omitted). In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court extended the favorable termination rule to a prisoner's challenge to the procedures used in a disciplinary proceeding that resulted in a change to the length of the prisoner's sentence, including the loss of accumulated good-time credits. *See id.* at 648. Thus, a prisoner may not proceed with a § 1983 action challenging the imposition of a disciplinary sanction that affects the length of his or her sentence "unless he [or she] has shown that the sanction ... ha[s] been overturned through administrative channels or by a state or federal court." *Peralta v. Vasquez*, 467 F.3d 98, 100 (2d Cir. 2006).

In *Peralta*, the Second Circuit considered a situation in which prison officials had subjected a prisoner to sanctions that affected the duration of his confinement as well as sanctions that affected only his conditions of confinement. The court held that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but ... he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement.*" 467 F.3d at 104. The Second Circuit remanded the case to the district court with instructions for the court to ascertain whether the

prisoner had formally agreed to waive all claims challenging the duration of his imprisonment. *See id.* at 106.

If the plaintiff was to prevail on his challenges to the disciplinary reports issued to him for threats, interfering with safety and security, contraband, the guilty findings would be called into question.  Because the plaintiff has not demonstrated that the dispositions of the disciplinary charges have been invalidated, *Heck* bars the due process claims arising from the dispositions of the disciplinary charges unless the plaintiff "abandon[s], not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding he is attacking in [this] § 1983 suit."  *Id.* at 104.

Accordingly, if the plaintiff chooses to file an amended complaint to reassert his Fourteenth Amendment procedural due process claim, he shall include a paragraph in the amended complaint indicating whether, in order to pursue his claims relating to disciplinary sanctions affecting the conditions of his confinement, he waives *for all time* all claims relating to disciplinary sanctions affecting the duration of his confinement (*i.e.*, the forfeiture of a total of 60 days of RREC).

## 2.      **Fourteenth Amendment – Disciplinary Reports Lieutenant Tolmis**

The plaintiff alleges that after the search of his cell on August 10, 2018, Lieutenant Tolmis informed him that he would be escorted to the restrictive housing unit because officers had discovered contraband items in his cell and it was not clear whether the contraband belonged to him or his cellmate.   Compl. ¶¶ 63-64.  The plaintiff does not otherwise refer to or assert allegations regarding the conduct of Lieutenant Tolmis in the body of the complaint.

26

The plaintiff does not appear to challenge the decision by Lieutenant Tolmis to place him in the restrictive housing unit until officials could determine who owned the contraband items that were discovered in his cell.   In his description of his Fourteenth Amendment claims, however, the plaintiff contends that Lieutenant Tolmis violated his due process rights by failing to "properly supervise and investigate" and by helping to "fabricate evidence" at his disciplinary hearing.  *Id.* ¶ 328(h).   There are no facts to suggest that Lieutenant Tolmis was involved in the decision to keep the plaintiff in the restrictive housing unit after his initial placement in the unit on August 10, 2018 or that Lieutenant Tolmis issued him a disciplinary report in connection with the contraband items that were found in his cell.  Nor are there facts indicating that Lieutenant Tolmis was assigned to investigate the disciplinary charges.  The conclusory allegation that Lieutenant Tolmis failed to properly supervise or investigate and was involved in fabricating evidence fails to state a claim upon which relief may be granted.  *See Iqbal*, 556 U.S. at 678. The Fourteenth Amendment due process claim asserted against Lieutenant Tolmis is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 3.      Fourteenth Amendment – Disciplinary Reports Warden Corcella and Deputy Warden Egan

In his description of his Fourteenth Amendment due process claims, the plaintiff contends that Warden Corcella and Deputy Warden Egan failed to "properly investigate, supervise and train subordinates" and "helped [to] fabricate evidence" at his disciplinary hearing. *Id.* ¶ 328(f)-(g) & (u).   The plaintiff does not identify the evidence that he claims Warden Corcella and Deputy Warden Egan helped to fabricate.  The plaintiff includes no other facts regarding the involvement of these defendants in the issuance of the four disciplinary reports or the hearing held to address the reports.

A plaintiff seeking to recover money damages under section 1983 from a defendant in his or her individual capacity must demonstrate "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "liability for supervisory government officials cannot be premised on a theory of respondeat superior because § 1983 requires individual, personalized liability on the part of each government defendant." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). To demonstrate personal involvement, a plaintiff is required to plead that:

> 1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).[3] Once a plaintiff properly alleges that a defendant was personally involved in a constitutional deprivation, he or she "must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo*, 770 F.3d at 116.

There are no allegations that either Warden Corcella or Deputy Warden Egan was directly involved in or aware of the issuance of the disciplinary reports or that either official was assigned to investigate the disciplinary charges or was present at the hearing held to address the

---

[3] The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Lombardo v. Graham*, No. 19-1535-PR, 2020 WL 1909581, at *2 (2d Cir. Apr. 20, 2020) (summary order) ("Although we have observed that *Iqbal* may have heightened the requirements for supervisory liability by requiring more direct personal involvement, we need not decide that issue where, as here, the allegations are also insufficient to state a claim under *Colon*.") (citing *Grullon*, 720 F.3d at 139). For purposes of this decision, it is assumed that the categories outlined in *Colon* remain valid.

charges.  Nor are there allegations that Warden Corcella or Deputy Warden Egan considered or decided the plaintiff's appeal of the disciplinary findings.  Nor are there facts suggesting that either of them created a policy under which unconstitutional acts occurred.  The plaintiff also offers no facts in support of his claim that Warden Corcella and Deputy Warden Egan failed to properly supervise or train subordinates in connection with the issuance and disposition of the disciplinary reports.  Conclusory statements are insufficient to state a plausible claim for relief. *See Colon v. Annucci*, 344 F. Supp. 3d 612, 630 (S.D.N.Y. 2018) ("This conclusory statement, which merely parrots [the fourth and fifth] personal involvement categories verbatim is insufficient to plausibly allege personal involvement.")  (citing *Samuels v. Fischer*, 168 F. Supp. 3d 625, 636 (S.D.N.Y. 2016) ("Second Circuit law has long taught that, even within the context of the *Colon* framework, merely reciting the legal elements of a successful § 1983 claim for supervisory liability does not meet the plausibility pleading standard.") (alterations and internal quotation marks omitted)).  The claims that Warden Corcella and Deputy Warden Egan violated the plaintiff's Fourteenth Amendment procedural due process rights in connection with the issuance and disposition of four disciplinary reports in August 2018 are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### 4.    Fourteenth Amendment – FOIA Requests

The plaintiff alleges that FOIA Liaison/Correctional Counselor Hakins did not timely process his requests submitted under Connecticut's FOIA seeking documents filed in connection with the four disciplinary reports issued to him in August 2018.  The allegation that FOIA Liaison Hakins failed to comply with a state law does not state a claim of a violation of the plaintiff's federally or constitutionally protected rights.  *See Harris v. Taylor*, 441 F. App'x 774,

775 (2d Cir. 2011) ("[F]ailure to comply with a state law or administrative directive does not by itself establish a violation of § 1983.") (citing *Doe v. Connecticut Department of Child & Youth Services,* 911 F.2d 868, 869 (2d Cir. 1990)).  Furthermore, the plaintiff was not without recourse when FOIA Liaison/Correctional Counselor Hakins allegedly denied or failed to timely respond to his FOIA requests.  *See* Conn. Gen. Stat. § 1–206(b)(1) ("Any person denied the right to inspect or copy records under section 1–210 or wrongfully denied the right to attend any meeting of a public agency or denied any other right conferred by the Freedom of Information Act may appeal therefrom to the Freedom of Information Commission, by filing a notice of appeal with said commission. A notice of appeal shall be filed within thirty days after such denial. . . .").  Thus, the claim that FOIA Liaison Hakins neglected to process his FOIA requests in accordance with the time frames set forth in Connecticut's FOIA is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

In his description of claims, the plaintiff also asserts that Hakins assisted other defendants in fabricating evidence against him at the disciplinary hearing.  There are no facts to suggest that Hakins was involved in the issuance of the disciplinary reports or participated in the disciplinary hearing in any way.  Thus, the plaintiff has not stated a plausible claim that Hakins assisted other defendants in fabricating evidence against him.  Accordingly, the conclusory and unsupported claim that FOIA Liaison/Correctional Counselor Hakins assisted other defendants in fabricating evidence in support of the disciplinary charges made against the plaintiff is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### 5.    Fourteenth Amendment – Grievances

The plaintiff alleges that Correctional Counselor Ibisevic not only filled in as his advisor

at the disciplinary hearing but also acted as the ARC at Garner during his confinement at that facility.  The plaintiff contends that in this role, Correctional Counselor Ibisevic violated his Fourteenth Amendment due process rights by failing to properly review and respond to multiple grievances that he filed in September 2018.

The Second Circuit has held that neither state directives nor "state statutes ... create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003).  Thus, allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's constitutional rights.  *See Swift v. Tweddell,* 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established [ ] that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim.") (collecting cases); *Fernandez v. Armstrong*, 2005 WL 733664, at *9 (D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures [set forth in Administrative Directive 9.6] is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right.").  In addition, "prisoners do not have a due process right to a thorough investigation of grievances." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (citing *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341–42 (S.D.N.Y. 2003) ("The corrections officers' failure to properly address [plaintiff's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process

31

because [plaintiff] was not deprived of a protected liberty interest.")).

The plaintiff's allegation that Correctional Counselor/ ARC Ibisevic neglected to timely or properly process multiple grievances that he filed at Garner in accordance with State of Connecticut Department of Correction Administrative Directive 9.6, administrative remedies, does not rise to the level of a due process violation under the Fourteenth Amendment. *See Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012) ("Brown's argument that he has a federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless."). The Fourteenth Amendment due process claim arising from the improper processing of the plaintiff's grievances by Correctional Counselor/ ARC Ibisevic is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 6.    First Amendment – Retaliation

In count three of the complaint, the plaintiff includes three different retaliation claims. *See* Compl. at 141-45. The Second Circuit has "instructed district courts to "'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)). Retaliation claims "stated in wholly conclusory terms" are insufficient. *Id.* (internal quotation marks and citations omitted). To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation

marks and citation omitted).

Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *Id.* "[A]dverse action on the part of the defendants" is defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchack*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Davis*, 320 F.3d at 353). As to the third requirement, a plaintiff must show that "the protected conduct was a substantial or motivating factor" for the defendant's action. *Holland v. Goord,* 758 F.3d 215, 225 (2d Cir.2014) (citation and internal quotation marks omitted).

In support of his first retaliation claim, the plaintiff contends that Commissioner Semple, Warden Corcella, Deputy Warden Egan and Captains Kenny and Hurdle knew that he had been transferred from MacDougall-Walker to Garner in June 2018 because he and Ms. Curto had made complaints about the actions of Alex Cotto in texting, calling and harassing Ms. Curto in January 2017. Compl. ¶¶ 330(b) to (f). At the time of the alleged improper communications with Ms. Curto, Officer Cotto had retired from his position as a correctional officer with the Department of Correction and the plaintiff was not in prison. The plaintiff contends that defendants Semple, Corcella, Egan, Kenny and Hurdle also knew that it was likely that other individuals at Garner could retaliate against him for the complaints made about Officer Cotto's conduct or that these defendants encouraged other defendants to retaliate against him because of the complaints. *Id.*

With regard to the first prong of the retaliation standard, the plaintiff relies on Ms. Curto's submission of a written complaint about the incident involving Officer Cotto's improper communications with her in January 2017 to Warden Mulligan at MacDougall-Walker and a

33

grievance that he filed in July 2018 about Officer's improper communications with Ms. Curto in January 2017. The plaintiff alleges that on August 20, 2018, a prison official rejected his grievance as untimely.

Ms. Curto's complaints regarding Officer Cotto's behavior do not constitute the exercise of the plaintiff's First Amendment right of free speech or for redress of grievances. Although the plaintiff's grievance constitutes a protected activity, there are no facts to suggest that during his confinement at Garner from June to October 2018, Semple, Corcella, Egan, Hurdle, Kenny, or any other defendant was aware of his grievance or concerns about the Officer Cotto's behavior towards Ms. Curto that had occurred in January 2017, or that any knowledge of his concerns or complaints influenced their actions towards the plaintiff in a negative manner. Thus, the plaintiff has not met the third element of a retaliation claim. The Court concludes that the plaintiff's conclusory allegations of retaliation on the part of defendants Semple, Corcella, Egan, Hurdle and Kenny fail to state a plausible First Amendment claim. This First Amendment retaliation claim is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

The plaintiff's second retaliation claim arises from the decision by Warden Corcella, Deputy Warden Egan and Captain Kenny to remove Ms. Curto from the plaintiff's visitation list in mid-September 2018 because they suspected that she might be conveying contraband into the prison. The plaintiff contends that Ms. Curto had been sending emails to Warden Corcella and that the Warden removed her from the list in response to her emails. The plaintiff appears to be asserting a retaliation claim on behalf of Ms. Curto. The Supreme Court has consistently held that a litigant does not have standing to sue on behalf of other litigants. *See Singleton v. Wulff*, 428 U.S. 106, 114 (1976) ("Ordinarily, one may not claim standing in this Court to vindicate the

34

constitutional rights of some third party") (internal quotation marks and citations omitted);

*Hollingsworth v. Perry*, 570 U.S. 693, 707–08 (2013) ("[i]n the ordinary course, a litigant must

assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights

or interests of third parties") (internal quotation marks and citation omitted).  Accordingly, the

retaliation claim based on the exercise of Ms. Curto's First Amendment rights is dismissed.  *See*

28 U.S.C. § 1915A(b)(1).

The third retaliation claim arises from the plaintiff's confinement at MacDougall-Walker

in June 2018 and is asserted against Warden Mulligan.  The Court addresses the claim below.

### 6.    Correctional Officers Kennedy and Sciascia – Inmate Request

The plaintiff asserts that on August 16, 2018, he asked Correctional Officer Kennedy to

place his request to make two legal telephone calls in the mailbox assigned to Correctional

Treatment Officer O'Donnell.  Compl. ¶¶ 102-03.  Correctional Officer Kennedy picked up the

request from the plaintiff and instead of immediately putting the request in Treatment Officer

O'Donnell's box, he put it on a table next to Correctional Officer Sciascia.  *Id.*  ¶¶ 103-04.

When the plaintiff observed Officer Sciascia put the request in his pocket, he called Officer

Sciascia over and reminded him that the request was addressed to Correctional Treatment Officer

O'Donnell.  Officer Sciascia then placed the request in Officer O'Donnell's box.  *Id.* ¶¶ 104-07.

The plaintiff does not allege that Officer O'Donnell did not to receive the request or that

the plaintiff could not make his legal calls.  Thus, the plaintiff has not alleged that Officers

Kennedy or Sciascia violated his federally or constitutionally protected rights.  The allegations

asserted against Officers Kennedy and Sciascia relating to their failure to immediately place his

August 16, 2018 inmate request in the proper mailbox are dismissed.   *See* 28 U.S.C. §

1915A(b)(1).


   **E.**   **Release from Prison - January 2017**
       **MacDougall-Walker - May to June 2018; Garner - June to October 2018**
       **Corrigan-Radgowski - October 2018 - September 2019**
       **Carl Robinson - September to December 2019**

   In addition to the First and Fourteenth Amendment claims addressed above, the plaintiff

asserts the following additional claims: a Fourth Amendment claim that Correctional Officer

Cotto, Commissioner Semple, Lieutenants John and Jane Doe, and Warden Mulligan violated his

right to privacy by failing to supervise Officer Cotto prior to January 9, 2017 and by failing to

investigate the incident involving Officer Cotto's improper communications with Ms. Curto on

January 10, 2017; a Fourteenth Amendment claim that Correctional Officer Cotto,

Commissioner Semple, Lieutenants John and Jane Doe violated his due process rights at

MacDougall-Walker in May and June 2018; a First Amendment claim that his transfer by

Warden Mulligan from MacDougall-Walker to Garner in June 2018 was retaliatory; an Eighth

Amendment claim that Captain Kenny sexually harassed him on August 13, 2018 at Garner; an

Eighth Amendment claim that Commissioner Semple, Warden Corcella, Deputy Warden Egan,

and Captains Kenny and Hurdle failed to protect him from sexual assault by his cellmate and

from harming himself in August 2018 and failed to investigate the incidents involving the sexual

assault at Garner; an Eighth Amendment claim that Warden Corcella, Deputy Warden Egan, and

Commissioner Semple were deliberately indifferent to his medical and mental health needs

during his confinement at Garner from August to October 2018; a claim that Warden Corcella,

Deputy Warden Egan failed to investigate his complaint filed under the PREA at Garner; a

Fourteenth Amendment claim that Warden Faucher and ARC King violated his due process rights in failing to properly process his grievances during his confinement at Corrigan-Radgowski from October 2018 to September 2019; and a First Amendment claim that in December 2019, Deputy Warden Kenny, formerly Captain Kenny, retaliated against him by ordering his transfer from Carl Robinson to MacDougall-Walker.   *See* Compl. ¶¶ 324-32.  The Court concludes that these claims are improperly joined in this action.

Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action only if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions and occurrences, and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).  The Court approaches the determination of "[w]hat [might] constitute the same transaction or occurrence . . . on a case by case basis."  *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted).  In interpreting the terms transaction or occurrence as used in Rule 13(a), Fed. R. Civ. P., which governs counterclaims, the Second Circuit has observed that whether a counterclaim arises out of the same transaction as the original claim depends upon an assessment of "the logical relationship between the claims" and a determination of whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit."  *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978) (citations omitted). The Court applies an analogous interpretation to the terms transaction or occurrence as used in Rule 20(a)(2).

Rule 21 of the Federal Rules of Civil Procedure provides that a court "may sever any

claim against a party" pursuant to a motion filed by a party to the action or on its own.  Fed. R. Civ. P. 21.  In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: "(1) [do] the claims arise out of the same transaction or occurrence; (2) [do] the claims present some common question of law or fact; (3) [would] settlement of the claims or judicial economy be facilitated; (4) will prejudice [] be avoided; and (5) [will] different witnesses and documentary proof [be] required for the separate claims."  *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263–66 (D. Conn. 2012) (citation omitted).

The allegations pertaining to an incident that occurred during the plaintiff's release from prison in January 2017; incidents that occurred during the plaintiff's confinement at MacDougall-Walker in May and June 2018, Corrigan-Radgowski from October 2018 to September 2019 and Carl Robinson from September to December 2019; and incidents involving a sexual assault, sexual harassment, a failure to investigate a PREA complaint and to provide mental health or medical care, and the plaintiff's attempt to commit suicide, that occurred from August to October 2018 at Garner, do not all arise out of the same transaction or occurrence as the allegations pertaining to the four disciplinary reports issued to the plaintiff at Garner in August 2018 and the disposition of those reports.

The First, Fourth, Eighth, and Fourteenth Amendment claims arising from the incidents that occurred after the plaintiff's release from prison in January 2017, the incidents that occurred at MacDougall-Walker, Corrigan-Radgowski, and Carl Robinson in 2018 and 2019, and the incidents involving a sexual assault, sexual harassment, a lack of mental health and medical care, a failure to investigate a PREA complaint, and the plaintiff's attempt to harm himself that occurred at Garner in 2018 are not reasonably related to the Fourteenth Amendment due process

claims arising from issuance of the disciplinary reports to the plaintiff at Garner and the factual and legal theories related to each claim are not all common to each other.  Thus, different witnesses/testimony and documentary evidence would be required to prove the separate sets of claims at trial.  The Court concludes that the sets of unrelated allegations and defendants are not properly joined in this action and the relevant factors favor severance of these claims. *See Lindsay v. Semple*, No. 3:19-CV-751 (JCH), 2019 WL 3317320, at *10–11 (D. Conn. July 24, 2019) (severing and dismissing without prejudice all claims unrelated to due process claim as improperly joined in violation of Fed. R. Civ. P. 20)(citing *Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015) (advising plaintiff that improperly joined claims must be pursued in separate actions)).

Pursuant to Rules 20 and 21 of the Federal Rules of Civil Procedure, the Court will sever and dismiss without prejudice the Fourth Amendment claim arising in January 2017, the First and Fourteenth Amendment claims arising from the plaintiff's confinement at MacDougall-Walker in May and June 2018; the Eighth Amendment claims arising from the plaintiff's confinement at Garner from August to October 2018, the PREA investigation claim arising from the plaintiff's confinement at Garner from August to October 2018, the Fourteenth Amendment claim arising from the plaintiff's confinement at Corrigan-Radgowski from October 2018 to September 2019, and the First Amendment claim arising from the plaintiff's confinement at Carl Robinson from September to December 2019.  If the plaintiff seeks to pursue these claims, he must do so by filing separate lawsuits.

**ORDERS**

In accordance with the foregoing analysis, the Court enters the following orders:

**(1)**     The plaintiff's requests seeking monetary damages from the defendants in their official capacities for violations of his federal constitutional rights are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(2).  Further, the requests for declaratory and injunctive relief; the First Amendment retaliation claims asserted against Commissioner Semple, Warden Corcella, Deputy Warden Egan, and Captains Kenny and Hurdle; the Fourteenth Amendment procedural due process claims asserted against Warden Corcella, Deputy Warden Egan, and Lieutenant Tolmis; the Fourteenth Amendment due process claim related to the processing of FOIA requests asserted against Correctional Counselor/FOIA Liaison Hakins; the Fourteenth Amendment due process claim related to the processing of grievances asserted against Correctional Counselor/ARC Coordinator Ibisevic; and the claim that Correctional Officers Kennedy and Sciascia failed to immediately place the plaintiff's August 16, 2018 inmate request in the proper mailbox are all **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).

**(2)**     The Fourth Amendment claim arising during the plaintiff's release from confinement in January 2017; the First and Fourteenth Amendment claims arising from the plaintiff's confinement at MacDougall-Walker in May and June 2018; the Eighth Amendment claims arising from the plaintiff's confinement at Garner from August to October 2018; the PREA investigation claim arising from the plaintiff's confinement at Garner from August to October 2018; the Fourteenth Amendment claim arising from the plaintiff's confinement at Corrigan-Radgowski from October 2018 to September 2019; and the First Amendment claim arising from the plaintiff's confinement at Carl Robinson from September to December 2019 are **SEVERED** and **DISMISSED** without prejudice pursuant to Rules 20 and 21, Fed. R. Civ. P. The plaintiff may pursue these claims in separate lawsuits.

40

Accordingly, all claims against Correctional Officer Cotto, Commissioner Semple, Lieutenants John and Jane Doe, Warden Mulligan, Warden Corcella, Deputy Warden Egan, Correctional Officer Kennedy, Lieutenant Tolmis, Correctional Counselor/FOIA Liaison Hakins, Warden Faucher, and ARC King have been **DISMISSED**.  The Clerk is directed to terminate them as parties.

**(3)**     The Fourteenth Amendment procedural due process claims arising from the issuance of four disciplinary reports to the plaintiff in August 2018, the hearing held on August 30, 2018 to address and dispose of the disciplinary charges, and the decisions to deny the appeals of the disciplinary findings as asserted against Lieutenant/Disciplinary Hearing Officer McNeil, Lieutenant Durkin, Captains Kenny and Hurdle, Correctional Officers Major, Blekis, Sciascia, Hayward, and Snowden, and Correctional Counselors Ibisevic and Sheppard, and District Administrator Maldonado are **DISMISSED** without prejudice.  *See* 28 U.S.C. § 1915A(b)(1).

The Court will permit the plaintiff thirty days to file an amended complaint to reassert **only** his Fourteenth Amendment procedural due process claim related to the issuance of the four disciplinary reports in August 2018 and the disposition of those reports after a hearing in August 2018 and on appeal in September and October 2018 to add specific details of any restrictions placed on his liberty or privileges as compared with typical conditions of prison life in connection with the sanctions imposed at the conclusion of the disciplinary hearing.  Any amended complaint must also include a paragraph in which the plaintiff, in order to pursue the Fourteenth Amendment procedural due process claim relating to disciplinary sanctions affecting the conditions of his confinement, waives *for all time* all claims relating to disciplinary sanctions affecting the duration of his confinement (*i.e.*, the forfeiture of a total of 60 days of RREC).   If

the plaintiff fails to include this waiver in the amended complaint, he will not be permitted to proceed as to the Fourteenth Amendment procedural due process claim.

(4)     State of Connecticut Department of Correction records reflect that the plaintiff is no longer confined in any facility within the Department of Correction.  *See* http://www.ctinmateinfo.state.ct.us/searchop.asp (Plaintiff's CT DOC Inmate Number  is 262626).  Local Rule 83.1(c)(2) requires a self-represented litigant to keep the Clerk apprised of an address where Court orders and rulings can be mailed to him or her.  The Court previously advised the plaintiff that if his address changed during the litigation of the case, he must submit a written notice of a current mailing address and that if he failed to keep the Clerk informed of his current address, the case would be subject to dismissal.  *See* Order, Doc. 9.  The plaintiff has failed to notify the Clerk about his new mailing address as required by the Court's Order and Local Rule 83.1(c)(2).

**Accordingly, the plaintiff is directed to file a notice of his current mailing address within twenty-one (21) days of the date of this order.  The plaintiff's failure to file a notice of his current mailing address within the time specified, will result in the dismissal of this case.**

(4)     The Clerk shall send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

SO ORDERED at Hartford, Connecticut this 16th day of November, 2020.

_____/s/_____
Michael P. Shea
United States District Judge